UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                 )
GLOBAL EPOINT, INC.,             )
                                 )
          Plaintiff,             )
                                 )
     v.                          )     C.A. No. 11-197 S
                                 )
GTECH CORPORATION,               )
                                 )
          Defendant.             )
_____)
```

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, Chief Judge.

In 2001, Plaintiff Global ePoint, Inc. ("Global") sold its lottery assets to Defendant GTECH Corporation's ("GTECH") predecessor, Interlott Technologies, Inc. ("Interlott").[1] At the time the deal closed, Global received an initial payment of $13.5 million, and was entitled to receive additional payments of up to $15 million over the course of the next five years, if revenues and profits from these lottery assets reached certain benchmarks. Global claims that GTECH reneged on the agreement by failing to make all but a fraction of these payments; GTECH, in turn, claims that the requisite benchmarks were never reached, and that it owes Global nothing.

---

[1] GTECH admits it is bound by the contract at issue.

Both parties have moved for partial summary judgment. (ECF Nos. 58 and 65.) For the reasons set forth below, Global's Motion for Partial Summary Judgment is GRANTED IN PART AND DENIED IN PART and GTECH's Motion for Partial Summary Judgment is GRANTED IN PART AND DENIED IN PART.[2]

I.    Background[3]

In the late 1990s, Global developed a mechanism it called a "helical separator" for use in instant lottery ticket vending machines. (Pl.'s Statement of Undisputed Facts ("Pl.'s SUF") ¶ 2, ECF No. 59.) This mechanism cuts lottery tickets along a perforation, separating the tickets from one another, and dispensing them as requested. (Id.) Two machines manufactured by Global employed this technology – the Playpoint and the Counterpoint. (Id. at ¶ 5.) The Playpoint was a free-standing model, while the appropriately-named Counterpoint was designed to sit on the counter of a store. (Id.) GTECH offered a competing product called the EDS-Q, which also perforated and dispensed tickets. (Id. at ¶ 22.)

---

[2] Global and GTECH agree that summary judgment should be granted concerning the existence of a contract between the two entities and Global's performance under that contract. Additionally, the parties agree that summary judgment is appropriate regarding the inapplicability of the following affirmative defenses: laches, estoppel, waiver, statute of limitations and failure to mitigate. Therefore, Global's Motion for Summary Judgment is GRANTED as to these issues.

[3] Except where noted, none of the facts are in dispute.

In the 2001 deal with Interlott, Global sold the helical separator technology, and the right to produce the machines that utilized it. (Id. at ¶ 9.) Global and Interlott memorialized the terms of this sale in an Asset Purchase Agreement. (Id. at ¶¶ 8-9.) In 2003, Interlott merged with GTECH, and GTECH expressly assumed Interlott's responsibilities under the Asset Purchase Agreement. (Id. at ¶ 53.)

Two provisions of the Asset Purchase Agreement, the Deferred Payment Component and the Percentage Payment Component, are in issue in this case, because they establish the circumstances under which future payments must be made to Global. The Court begins by outlining the contours of these important (and confusing) provisions.

A.    The Deferred Payment Component

The Deferred Payment Component required that GTECH pay Global $150,000 per month for 60 months, which amount could be decreased based on gross profits earned each quarter. (Pl.'s SUF ¶ 10 and Ex. 3.) To determine whether GTECH properly modified the payment, GTECH was required to provide "[quarterly] statement[s] of the gross profits earned by [GTECH] . . . both from a combination of contract extensions and future orders from existing lottery customers of [Global] under [Global's] lottery contracts conveyed to [GTECH] under the Asset Purchase Agreement." (Id.) Section 4.7 of the Asset Purchase Agreement

identified the contracts transferred as part of the sale. (Id. at ¶ 13.)

Additionally, the Deferred Payment Component defined "existing lottery customers" to

> include customers pursuant to public competitive bids that have been submitted prior to Closing, if, after the effective date of this Agreement, an award is made to [Global] or to [GTECH] pursuant to [Global's] bid, and [GTECH] enters into a contract with such customer either directly or by assignment from [Global], in either case pursuant to such outstanding bid.

(Id. at ¶ 10.) Finally, under the Deferred Payment Component, GTECH agreed that, during the five-year period in which it was making deferred payments, it would "exercise commercially reasonable best efforts to procure contract extensions and future orders from existing lottery customers of [Global] under [Global's] lottery contracts conveyed to [GTECH] under the Asset Purchase Agreement." (Pl.'s SUF Ex. 3 at 63.)

B.    The Percentage Payment Component

The second key provision is the "Percentage Payment Component," which required that for the five years following the closing of the transaction, GTECH would "deliver to [Global] a statement of Applicable Revenues and Applicable Counterpoint Revenues." (Pl.'s SUF ¶ 11 and Ex. 4.) The Asset Purchase Agreement defined "applicable revenues" as "revenues generated by new sales or leases, other than revenues included in the

calculation of the Deferred Payment Component, of Playpoint, Counterpoint and other [Global]-designed lottery equipment." (Pl.'s SUF ¶ 12 and Ex. 4.) The Percentage Payment Component required GTECH to make payments of 10 percent of these revenues until a cap of $3 million was reached. (Id.) If that initial $3 million cap was reached, GTECH was then required to make additional payments of 10 percent of revenues only on Counterpoint machines sold, to a maximum of an additional $3 million. (Id.) GTECH further agreed to "continue to market Playpoint and Counterpoint units ('PC Units')" during this five-year period "by offering in connection with new procurements as to which the PC units meet applicable procurement specifications, such equipment to prospective customers of [GTECH] at gross profit margins that are no greater than those at which [GTECH's] similar or competitive equipment is offered to the same customer in connection with such procurement." (Id. at ¶ 11 and Ex 4.)

The proper scope of the Deferred Payment Component, and whether GTECH made payments under the Deferred Payment Component and Percentage Payment Component as required, are the central questions in this case. To answer these questions, the Court must delve into the meaning of the Asset Purchase Agreement and GTECH's actions in several states and around the world.

C.    Illinois

The State of Illinois awarded Global a lottery contract in 1994.    (Pl.'s SUF ¶ 57.)    Global and Illinois amended the contract several times.    (Id. at ¶ 58.)    When Global sold its assets to GTECH's predecessor, Interlott, the Third Amendment to the Illinois contract was operative.    (Id.)    The Fourth Amendment extended the agreement by one year from July 1, 2001 to June 30, 2002, and, among other things, included a 60-month lease term on all lottery machines leased by Illinois, measured from their date of installation.    (Id. at ¶ 59.)    Several amendments followed, culminating with a Seventh Amendment to the contract between GTECH and Illinois, which again extended the agreement by one year from July 1, 2003 to June 30, 2004, and included the same 60-month lease on all lottery machines from their date of installation.[4]    (Id. at ¶ 61.)    Unlike its predecessors, this Seventh Amendment to the Illinois contract contained no provision permitting an additional amendment, but it also did not preclude further amendment.    (Def.'s Statement of Undisputed Facts ("Def.'s SUF") ¶ 52, ECF No. 66; Pl.'s Statement of Disputed Facts ("Pl.'s SDF") ¶ 52, ECF No. 76.)

_____

[4] Machines put into service under the Fourth, Fifth, Sixth, and Seventh Amended Agreements would all have different lease termination dates, since the 60-month term was measured from their respective dates of installation.

By May 2004, 745 machines using Global's technology were operating in Illinois under this 1994 contract and its amendments. GTECH (and its predecessor, Interlott) included gross profits from this contract with the Illinois Lottery to calculate the Deferred Payment Component from August 2001 to May 2004. (Pl.'s SUF ¶ 65.)

On January 13, 2004, the Illinois lottery issued a request for proposal ("RFP"). (Id. at ¶ 62.) This RFP dictated that a successful bidder would set forth a plan for delivering and installing as many as 2,000 perforated instant lottery ticket machines. (Id. at ¶ 62.) The successful bidder would also be required "to conduct a thorough and comprehensive assessment of the [Illinois Lottery's] current process for the self-service sale of instant lottery tickets, and provide the [Illinois Lottery] with recommendations to maximize sales revenue for the [Illinois Lottery] and the successful vendor." (Id. at ¶ 62.)

The Illinois Lottery chose GTECH's bid and entered into an agreement with GTECH effective July 1, 2004 – the day the Seventh Amendment to the Illinois Lottery contract expired. (Id. at ¶ 63.) This 2004 contract called upon GTECH to temporarily remove from service the 745 machines then operating in Illinois, which used Global technology, and upgrade them. (Id. at ¶ 64.) After these upgrades were completed, Illinois continued making lease payments on these 745 machines in the

same amount as it did under the Seventh Amendment to the Illinois contract. (Id. at ¶ 64.) Ultimately, under this 2004 contract, GTECH supplied the Illinois lottery with 1,973 instant lottery ticket vending machines, in addition to the 745 machines it upgraded. (Def.'s SUF ¶ 38.) GTECH did not include the gross profits from the new machines or the upgraded machines in future Deferred Payment Component calculations after May 2004. (Def.'s Statement of Disputed Facts & Supplemental Undisputed Facts ("Def.'s SDF") Ex. J at GTECH00270, ECF No. 68-16.)[5]

D.    Maryland

After Global and Interlott entered into the Asset Purchase Agreement, but before the deal closed, Global entered into a contract with the Maryland State Lottery for the purchase of 50 Counterpoint machines. (Pl.'s SUF ¶ 18.) At that time, the Maryland Lottery did not award its lottery contracts through a public bidding process. (Id.) Throughout the timeframe pertinent to this case, GTECH included the gross profits from

---

[5]    The parties' dispute over when GTECH ceased reporting gross profit data from Illinois appears to be pure semantics. (Compare Pl.'s Statement of Undisputed Facts ("Pl.'s SUF") ¶ 67, ECF No. 59 (claiming GTECH stopped reporting gross profits from the Illinois Lottery in May 2004), with Def.'s Statement of Disputed Facts and Supplemental Undisputed Facts ("Def.'s SDF") ¶ 67, ECF No. 68, (claiming that GTECH included May 2004 revenues but ceased reporting revenues thereafter).) The Court has examined the relevant evidence, which establishes beyond a doubt that GTECH included Illinois revenues from May 2004, but did not include revenues for June 2004 or any date thereafter. (Def.'s SDF Ex. J at GTECH00270.)

this Maryland agreement in the Deferred Payment Component, as opposed to the Percentage Payment Component. (Pl.'s SUF Ex. 48 at No. 22.)

E. France

One of the contracts transferred from Global to GTECH's predecessor under the Asset Purchase Agreement was a 2001 contract with Editec relating to the French Lottery. (Pl.'s SUF ¶ 13 and Ex. 5.) Editec served as a kind of middleman, first between the French lottery and Global, and later, between the French lottery and Interlott. The contract between Global and Editec ran for a three-year term and automatically renewed for successive one-year terms unless either party gave written notice to cancel the contract.[6] (Pl.'s SDF ¶ 87.)

In 2003, the French Lottery issued an RFP. (Def.'s SUF ¶ 25.) GTECH's predecessor, Interlott, responded to the RFP, and ultimately won the contract with the French Lottery to produce 575 instant lottery ticket vending machines in 2005. (Id. ¶¶ 25-26.) GTECH did not include the gross profits from these 575 machines in its Deferred Payment Component calculations.

_____

[6] Global has also provided a copy of a 1999 contract between it, the French Lottery and Editec. (Pl.'s Statement of Disputed Facts ("Pl.'s SDF") Ex. L, ECF No. 76.) This contract set forth the terms under which the French Lottery could order lottery machines from Global until December 31, 2001. (Id. at Article 2.1; Article 17.)

F.    Other States

From December 2001 to May 2003, GTECH or its predecessor submitted responses to RFPs to seven different lotteries – the District of Columbia Lottery, the Michigan Lottery, the Ohio Lottery, the Maryland Lottery, the Arizona Lottery, the Texas Lottery, and a portion of the Pennsylvania Lottery.  (Pl.'s SUF ¶¶ 24, 28, 32, 36, 40, 44 and 48.)   GTECH has not produced evidence showing that it offered Counterpoint or Playpoint machines to any of these lotteries.

II. Standard of Review

Summary judgment will only be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In the summary-judgment context, the Court must view evidence in the light most favorable to the non-moving party, and must draw all reasonable inferences in the non-moving party's favor.  DeLia v. Verizon Commc'ns Inc., 656 F.3d 1, 3 (1st Cir. 2011).  Here, the parties have cross moved for summary judgment on two issues, but have separately moved for summary judgment on other issues.   When examining cross-motions for summary judgment the applicable standard does not change, and the court must "consider each motion separately, drawing all inferences in favor of each non-moving party in turn."  Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st Cir.

2014) (quoting <u>D&H Therapy Assocs., LLC v. Boston Mut. Life Ins.</u> <u>Co.</u>, 640 F.3d 27, 34 (1st Cir. 2011)).

"A genuine issue of fact exists where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Taylor v. Am. Chemistry Council</u>, 576 F.3d 16, 24 (1st Cir. 2009) (internal citation and quotation marks omitted). The fact that both sides have moved for summary judgment does not mean that the parties agree that no questions of fact exist. <u>Green Mountain Realty</u>, 750 F.3d at 38. Finally, the court must recognize that summary judgment has a dual nature. The moving party bears the initial burden of demonstrating a lack of a material issue of fact, which shifts the burden to the non-moving party, who then must show that the trier of fact could rule in his favor with respect to each issue. <u>Borges ex rel.</u> <u>S.M.B.W. v. Serrano-Isern</u>, 605 F.3d 1, 5 (1st Cir. 2010).

III. Discussion

The parties agree that Ohio law governs the Asset Purchase Agreement. Under Ohio law, a party asserting a claim for breach of contract must prove the existence of the contract, its own performance under the contract, breach by the other party and damages. <u>See, e.g.</u>, <u>Prime Props. Ltd. P'ship v. Badah Ents.</u>, No. 99827, 2014 WL 265501, at *3 (Ohio Ct. App. Jan. 23, 2014). Additionally, when the party asserting a breach of contract seeks future profits, it must prove that the profits were within

the contemplation of the parties, that the loss of profits was the probable result of the breach and that future profits are not too speculative. Telxon Corp. v. Smart Media of Del., Inc., Nos. 22098, 22099, 2005 WL 2292800, at *37 (Ohio Ct. App. Sept. 21, 2005).

Global and GTECH agree that a contract existed and that Global performed under the contract. Thus, the instant dispute focuses on whether a breach of the contract occurred, and if proximate cause has been established showing that damages resulted from any breach.

A.   Meaning of the Contract

Before analyzing whether GTECH breached the Asset Purchase Agreement, it must first be determined whether the agreement may be interpreted at this stage at all. Whereas an unambiguous contract may be interpreted as a matter of law, Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust, Inc., 156 Ohio App. 3d 65, 83 (Ohio Ct. App. 2004), "whe[n] an ambiguity resides in the language of the contract, or the language of the contract is unclear, determining the intent of the parties becomes a question of fact for the trier of fact at trial," rendering summary judgment inapplicable. Van Beusecum v. Cont'l Builders, No. 06-CAE-01-008, 2004 WL 3090232, at *5 (Ohio Ct. App. Dec. 27, 2004); see also Davis v. Loopco Indus., Inc., 609 N.E.2d 144, 145 (Ohio 1993) ("[I]f a term cannot be determined from the

four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term."). "[A] contract is unambiguous if it can be given a definite legal meaning." Westfield Ins. Co. v. Galatis, 797 N.E.2d 1256, 1261 (Ohio 2003).

The Asset Purchase Agreement is unambiguous and thus may be interpreted now. The Court has examined the contract as a whole, giving effect to the intent of the parties. Martin Marietta Magnesia Specialties, L.L.C. v. Pub. Utils. Comm'n, 954 N.E.2d 104, 110 (Ohio 2011). Global and GTECH disagree about the meaning of the portion of the Deferred Payment Component that required GTECH to deliver "a statement of the gross profits earned by GTECH . . . both from a combination of contract extensions and future orders from existing lottery customers of [Global] under [Global's] lottery contracts conveyed to [GTECH] under the Asset Purchase Agreement" and thereafter for GTECH to "deliver the Deferred Payments for each month during the quarter, calculated as described below."

Global claims that this portion of the Deferred Payment Component required GTECH to account for future orders and contracts from all existing Global customers.[7] Global's proposed

_____

[7] Global and GTECH both argue that the Deferred Payment Component is unambiguous, and yet, both parties seek to introduce parol evidence to clarify its meaning. Because the Court finds that the Deferred Payment Component is unambiguous,

13

construction, however, ignores the express qualifying language of the Deferred Payment Component. As GTECH correctly notes, the contract requires GTECH to account for contract extensions and future orders "from existing lottery customers of [Global] under [Global's] lottery contract conveyed to [GTECH] under the Asset Purchase Agreement." By its plain language, the Asset Purchase Agreement expressly limits its application solely to the contracts that it conveyed, which are set forth in Section 4.7(a)(1)(A). These, and only these contracts, as well as their extensions, fall under the Deferred Payment Component under the provision's plain language.

Therefore, the Court will move on to determining the merits of the parties' respective motions for partial summary judgment applying this reading of the Asset Purchase Agreement.

B.    Breach of Deferred Payment Component

Global has moved for summary judgment broadly on the question of whether GTECH breached the terms of the Deferred Payment Component. During oral argument, Global clarified its position, which is that GTECH owes money under the Deferred Payment Component due to improper accounting. Because questions of fact remain, Global's Motion for Summary Judgment on this question is DENIED.

---

it need not rely upon this evidence. See Sunoco, Inc. (R & M) v. Toledo Edison Co., 953 N.E.2d 285, 296 (Ohio 2011).

To support its position, Global relies on a report from a GTECH economic expert, who concludes that GTECH owes Global $257,845 under the Deferred Payment Component. (Pl.'s SUF ¶ 105.) This GTECH report bolsters, to some extent, the report of Global's economic expert, who also concluded that GTECH owes Global under the Deferred Payment Component.[8]

Global misconstrues the import of GTECH's expert report. While clearly the report is an admission by GTECH, the expert report does not by itself conclusively establish that GTECH breached the Deferred Payment Component. <u>Bianco v. Hultsteg AB</u>, No. 05 C 0538, 2009 WL 347002, at *12 (N.D. Ill. Feb. 5, 2009) (holding that statement within expert report is not a judicial admission, but is instead an admission by party).[9]

Additionally, GTECH counters both of these expert reports by pointing to a series of gross profit statements, which GTECH claims justify its unwillingness to remit additional payments to Global. (<u>See</u> Def.'s SDF Ex. J.) Global fails to provide any additional evidence that would allow the Court to ignore this series of quarterly gross profit statements. (<u>See</u> <u>id.</u>)

---

[8] Global's expert concluded that GTECH owed $8,970,605 under the Deferred Payment Component. Because Global has not moved for summary judgment with respect to a specific amount of damages, this discrepancy may be overlooked.

[9] Global is free to use this admission against GTECH moving forward.

Global's expert certainly refutes these calculations, but GTECH currently stands by them, despite the statements of its economic expert. Thus, these reports establish that questions of fact remain on this issue, and summary judgment is inappropriate.

C.   The Illinois Lottery[10]

Issuing an RFP potentially marks a landmark moment in a government procurement.   The question here is whether the contract that resulted from the Illinois RFP process in January 2004 was a new contract between GTECH and the state, or the modification of an already existing contract.   While this issue is close, the Court finds that the RFP resulted in a new contractual relationship between GTECH and Illinois, which began when a new contract became effective on July 1, 2004. Therefore, for the reasons outlined in more detail below, with respect to whether GTECH breached the Deferred Payment Component by ceasing to report financial data from the Illinois Lottery at the end of May 2004, Global's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART, and GTECH's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.

---

[10] The Court has not considered GTECH's argument that the Illinois Lottery was statutorily required to enter into a new contract in 2004 because this argument was raised for the first time in GTECH's reply brief. Riendeau v. Astrue, No. 09-149 ML, 2010 WL 1490817, at *3 n.6 (D.R.I. Mar. 12, 2010) report and recommendation adopted, No. 09-149 ML, 2010 WL 1486499 (D.R.I. Apr. 13, 2010) (holding argument is waived when raised for first time in reply brief).

In 1994, the Illinois Lottery issued an initial RFP, and Global was the successful bidder. Thereafter, Global and the Illinois Lottery entered into a contract, which the Illinois lottery and the parties amended a total of seven times. Global transferred its rights and obligations under the Illinois contract to Interlott in the Asset Purchase Agreement. GTECH later assumed Interlott's responsibilities under the contract. The Seventh Amendment to the contract extended the existing contract, from July 1, 2003 to July 1, 2004. Under the amendments to the Illinois contract, the 745 lottery machines in use in Illinois by 2004 were subject to five year-leases.

While the Seventh Amendment was in effect, the Illinois Lottery issued a new RFP in January 2004, which called upon bidders to devise a plan for providing up to 2,000 instant lottery vending machines in Illinois, and to develop a strategy for what to do with the existing 745 lottery machines then in use. GTECH won this bid, provided nearly 2,000 instant lottery machines and refurbished all 745 existing machines. Global now claims GTECH did not properly compensate it 1) for the contract entered into in response to the 2004 RFP or 2) for the 745 refurbished machines.

When the parties do not dispute the underlying facts, the determination of whether a breach of contract occurred is a question of law. <u>Pettit v. Glenmoor Country Club, Inc.</u>, No.

2013CA000108, 2014 WL 1340098, at *3 (Ohio Ct. App. Mar. 10, 2014). The crux of this dispute is whether the 2004 contract with the Illinois Lottery was an extension of the previous contract or an entirely new contract.[11] A contract modification does not destroy the underlying contract, and thus a modified contract would require GTECH to pay Global under the Deferred Payment Component. Conversely, a new contract terminates the obligations that exist under the prior contract, and would result in little to no payment due under the Deferred Payment Component.

"A modification of a contract is a change in one or more respects which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed." Int'l Bus. Lists, Inc. v. Am. Tel. & Tel. Co., 147 F.3d 636, 641 (7th Cir. 1998) (interpreting Illinois law). "[T]he essential requirements for contract formation and modification are identical: offer, acceptance, and consideration." Genzyme Corp. v. Disc. Drugs Wis., Inc., No. 08 C 5151, 2010 WL 744275, at *4 (N.D. Ill. Feb. 26, 2010). To determine whether a contract was modified or a new contract created, "the issue is not whether changes were made to an existing agreement, but rather whether existing rights were

<hr>

[11] While the Asset Purchase Agreement is to be interpreted under Ohio law, the contract with the Illinois Lottery is interpreted in accordance with Illinois law.

significantly altered." <u>Transworld Sys., Inc. v. Ohio Univ.</u>,
No. 2003-01873-AD, 2003 WL 22905242, at *5 (Ohio Ct. Cl. Nov.
26, 2003); <u>see also</u> <u>McKay Nissan, Ltd. v. Nissan Motor Corp. in</u>
<u>U.S.A.</u>, 764 F. Supp. 1318, 1319 (N.D. Ill. 1991) ("[T]he
modifications must effect a material alteration of the parties'
rights and obligations before it can be said that the parties
intended a new contract or agreement."). Importantly, Global
recognizes that an RFP signals a new development in a
contractual relationship with a public entity, distinct from a
contract extension. (Def.'s SUF ¶ 121.) By issuing an RFP,
instead of merely negotiating an amendment with GTECH as it had
seven times prior, the Illinois Lottery expressed its
willingness to end the 1994 contract.[12] Following GTECH's
successful bid, GTECH and the Illinois lottery then entered into
a new contract, which ended the 1994 contract. This new
contract went into effect on July 1, 2004 and was not covered by
the Deferred Payment Component because it was not transferred
under Section 4.7(a)(1)(A). Therefore, GTECH was not required
to include profits from the nearly 2,000 new lottery machines

---

[12] That the Seventh Amendment, unlike its predecessors,
contained no provision permitting an additional amendment adds
more credence to the conclusion that Illinois clearly sought to
end the 1994 contractual relationship in 2004. Global does not
seriously dispute this point. Instead, Global merely points out
that the Seventh Amendment did not preclude further extensions.

put into service under this July 1, 2004 contract, and summary judgment will enter in GTECH's favor on this issue.

As a fallback position, Global argues that in the event that the Court were to find that the 2004 contract marked the beginning of a new contractual relationship between GTECH and the Illinois Lottery, the 745 machines already in use in Illinois should continue to be counted toward the Deferred Payment Component. In support of this position, Global argues that these machines were subject to 5-year leases that were never officially terminated, despite these leases being terminable on 90 days' notice in writing. (Def.'s SDF ¶ 131 and Ex. DD ¶ 11; Exs. EE-HH.) Global notes that the 2004 contract entered into by Illinois and GTECH required that, "[f]or the balance of the lease term"[13] of each of these machines, Illinois pay GTECH "the compensation payable pursuant to the [Seventh Amended Agreement]." (Pl.'s SUF Ex. 35 at ¶ 9.) Upon what would have been the expiration of each machine's respective lease term, Illinois would be bound by new payment terms. (Id.) According to Global, these two terms of the 2004 contract prove that the leases on these 745 machines remained intact.

The Court's finding that Illinois and GTECH entered into a new contract in July 2004 forecloses Global's fallback argument.

---

[13] The machines had varied lease termination dates since each machine's 5-year lease terms ran from the date of its installation.

20

Global's entitlement to future payments derives from the 1994 contract with Illinois that it transferred to Interlott as part of the Asset Purchase Agreement. The leases on these 745 machines are a part of the amendments to that contract. (Pl.'s SUF Ex. 35.) The 2004 contract entered into by Illinois and GTECH terminated the 1994 contract, and as a result, severed the leases on these 745 machines and Global's entitlement to future payments related to them. These machines were then governed by new leases created by the 2004 contract.

That this new agreement called for Illinois to make the same payment to GTECH as the earlier lease does not mean it was a continuation of that lease. Instead, the borrowing of that payment term came within the larger context of GTECH attempting to preserve a relationship with the Illinois Lottery, after the Illinois Lottery had issued an RFP. Therefore, the Deferred Payment Component did not require GTECH to include gross profits from the 745 machines already in use in Illinois after July 1, 2004, and summary judgment shall enter in GTECH's favor on this issue.

Because the new contract began on July 1, 2004, GTECH was required to include gross profits from these 745 machines before July 1, 2004. The undisputed record establishes that GTECH ceased making payments under the Seventh Amended contract at the end of May 2004. (Pl.'s SDF Ex. J at GTECH00270.) Thus, GTECH

was bound to make a payment for June 2004 under the Deferred Payment Component for the 745 machines then in use. It failed to do so. (Id.) Therefore, summary judgment shall enter in Global's favor regarding GTECH's breach of the Deferred Payment Component in June 2004 for failing to include these 745 machines in its Deferred Payment Component calculations.

For the reasons stated above, Global's Motion for Summary Judgment regarding whether GTECH breached the Deferred Payment Component in Illinois will be granted in part and denied in part. GTECH's Motion for Summary Judgment regarding whether GTECH breached the Deferred Payment Component in Illinois will be granted in part and denied in part.

D.  The Maryland Lottery

Next, Global argues that GTECH should not have included the purchase of 50 Counterpoint machines in the Deferred Payment Component as it did, but instead should have included the purchase of these machines in the Percentage Payment Component. Global seeks summary judgment on this issue. Because questions of fact remain regarding whether these machines were properly accounted for, Global's Motion for Summary Judgment in this respect is DENIED.

After Global and Interlott signed the Asset Purchase Agreement, but before the deal closed, the Maryland Lottery purchased 50 Counterpoint units. After these machines were

deployed within Maryland, Interlott and GTECH included the income and expenses associated with these machines in the Deferred Payment Component. Under the Asset Purchase Agreement, lottery contracts were included in the Deferred Payment Component if they were transferred pursuant to Section 4.7 of the agreement or "public competitive bids [were] submitted prior to the Closing" and "an award [was] made to [Global] or to [GTECH] pursuant to [Global's] bid, and [GTECH] enter[ed] into a contract with such customer either directly or by assignment from [Global]. . . ." No contract with Maryland was transferred under Section 4.7. During the timeframe at issue, the Maryland Lottery awarded its contracts without a competitive bidding process, and thus, according to Global. this purchase would not fall within the Deferred Payment Component. Instead, Global argues that the sale of 50 machines to Maryland should have counted as a new sale for which it should have been compensated under the Percentage Payment Component, which required GTECH to remit funds associated with the sale of new Playpoint and Counterpoint machines to Global.

While Global's position has merit, it falls short at this point for two reasons. First, as GTECH notes, Global's initial Complaint in this action stated that the Maryland Lottery should be included in the Deferred Payment Component – the exact opposite position it now takes. (Def.'s SDF ¶ 161.) While the

23

filing of an amended complaint typically renders the original complaint "dead letter," Connectu LLC v. Zuckerberg, 522 F.3d 82, 91 (1st Cir. 2008), under "certain circumstances," the statements made in the superseded complaint "may be party admissions, usable as such, despite the subsequent amendment of the complaint." InterGen N.V. v. Grina, 344 F.3d 134, 144-45 (1st Cir. 2003). These "certain circumstances" typically involve situations similar to those here, where a party's theory of the case changes in its amendment, as opposed to situations where its theory is merely amplified through amendment. Wiseman v. Reposa, 463 F.2d 226, 227 (1st Cir. 1972) (holding original complaint was admission where it alleged an accident occurred on a different date than the amended complaint); Raulie v. United States, 400 F.2d 487, 526 (10th Cir. 1968) ("Thus, while an amended pleading by a litigant in which he assumes a position in respect of a matter of objective fact at direct variance with an original pleading earlier filed by him in an action, is effective to supersede the original pleading in respect of the making up of issues, the earlier pleading may, nevertheless, in the trial upon the facts, be exposed as evidence of the declaration by the pleader, at an earlier date, of the factual reality."); see also 6 Charles Alan Wright, Arthur R. Miller, &

Mary Kay Kane, <u>Federal Practice and Procedure</u> § 1476 (3d ed. 2010).[14]

Because of the amendment to the Complaint, "the superseded portion ceases to be a conclusive judicial admission; but it still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated, though controvertible, like any other extrajudicial admission made by a party or his agent." <u>Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.</u>, 32 F.2d 195, 198 (2d Cir. 1929). Put another way, "[a]s a matter of pleading, the original complaint ha[s] disappeared. As an admission against interest, it ha[s] not." <u>Wiseman</u>, 463 F.2d at 227. Importantly, "a district court may consider a statement or allegation in a superseded complaint as rebuttable evidence when determining whether summary judgment is proper." <u>W. Run Student Hous. Assocs. LLC v. Huntington Nat'l Bank</u>, 712 F.3d 165, 173 (3d Cir. 2013).

Second, Global's answers to interrogatories state that Maryland should be included in the Deferred Payment Component. (Def.'s SDF ¶ 163.) A district court may properly consider

---

[14] This is not to say that Global is judicially estoppped from asserting its new position. "Absent some sign of unfair advantage—and none exists here—the mere retraction of statements made in an original complaint does not justify the invocation of judicial estoppel." <u>InterGen N.V. v. Grina</u>, 344 F.3d 134, 145 (1st Cir. 2003).

answers to interrogatories at summary judgment. Fed. R. Civ. P. 56(c). Global's answers to interrogatories constitute evidentiary admissions. <u>Bianco</u>, 2009 WL 347002, at *12. Global explains that its answers to interrogatories came at an early point in the litigation and argues that a party should be permitted to change its answer to interrogatories as it learns more about the case. This argument suffers from two shortcomings. Crucially, to date, Global has not moved to amend its answers to interrogatories, even though it is permitted to do so. <u>See</u> 8B Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, <u>Federal Practice and Procedure</u> § 2181 (3d ed. 2010) ("[I]t has been held that the court has discretion to allow answers to interrogatories to be amended."). Additionally, if Global believed that the interrogatory request came too early in the litigation, it could have requested to provide its answers at a later time. Fed. R. Civ. P. 33(a)(2); 8B Wright, Miller, & Marcus, <u>supra</u> § 2167.

Taking into account all of the evidence presently before the Court, questions of fact remain on this issue, and summary judgment is inappropriate. For that reason, Global's Motion for Summary Judgment on this issue will be denied.

E.   French Lottery

As discussed in Section III.C, <u>supra</u>, the issuance of an RFP that results in a new contract signals a change in the

relationship between a governmental entity and a company that provides it with goods and services. In 2001, Global and Editec entered into an agreement under which Editec would serve as Global's distributor in France. (Pl.'s SDF ¶ 13.) The contract between Global and Editec ran for a three-year term, which automatically renewed for additional successive one-year terms unless either party provided written notice of cancellation. (Pl.'s SDF ¶ 87.) GTECH apparently never provided Editec with written notice that the agreement between the two companies had ended. Global, Editec and the French lottery entered into a contract in 1999. Global and GTECH agree that this contract was transferred as part of the Asset Purchase Agreement. Critically, however, this contract expired by its own terms on December 31, 2001. (Pl.'s SDF Ex. L at Article 2.1, Article 17.) No evidence in the record indicates that this contract was ever extended.

In 2003, the French Lottery issued an RFP for new lottery machines. GTECH's predecessor responded to the RFP, without Editec, and ultimately won the contract, entering into an agreement with the French lottery in June 2005 for the production of 575 new instant lottery ticket dispensing machines. (Def.'s SUF ¶¶ 25-26.) Global now claims that the 2005 contract with the French lottery should have been included in the Deferred Payment Component.

Global's position overlooks the impact of the new contract entered into as a result of the RFP as discussed in Section III.C, _supra,_ and that the 1999 contract conveyed under the Asset Purchase Agreement expired by its own terms. The 2005 contract was not conveyed in the Asset Purchase Agreement and need not have been included in the Deferred Payment Component.

For the foregoing reasons, GTECH's Motion for Summary Judgment regarding the French Lottery will be granted.

F.    Other States

Finally, Global claims that GTECH breached the Deferred Payment Component by failing to market the Counterpoint and Playpoint lottery machines in connection with future procurement opportunities. It is undisputed that GTECH or its predecessor bid on contracts with seven different lotteries from December 2001 to May 2003. (Pl.'s SUF ¶¶ 24, 28, 32, 36, 40, 44 and 48.) In none of these bids did GTECH include Playpoint or Counterpoint machines. Therefore, according to Global, GTECH breached the Percentage Payment Component by failing to "continue to market Playpoint and Counterpoint units ('PC Units')" during the five-year period covered by the Percentage Payment Component "by offering in connection with new procurements as to which the PC units meet applicable procurement specifications such equipment to prospective customers of Buyer at gross profit margins that are no greater

than those at which Buyer's similar or competitive equipment is offered to the same customer in connection with such procurement." (Pl.'s SUF ¶ 11 and Ex. 4.)

GTECH claims that Global has completely failed to present evidence that its failure to offer these machines was the proximate cause of Global's damages. Both sides have moved for summary judgment. Because the Court agrees that Global has failed to prove causation, GTECH's Motion for Summary Judgment concerning its marketing efforts will be GRANTED and Global's Motion for Summary Judgment is DENIED.

Global's claim that GTECH failed to market its products seeks lost profits that Global claims it would have earned if not for GTECH's wrongful conduct. "[L]ost profits may be recovered only if: (1) foreseeable - the profits were within the contemplation of the parties at the time the contract was made; (2) proximately caused - the loss of profits was the probable result of the breach of contract; and (3) the profits are not too remote or speculative - they may be shown with reasonable certainty." Telxon, 2005 WL 2292800, at *37; see also Charles R. Combs Trucking, Inc. v. Int'l Harvester Co., 466 N.E.2d 883, 887 (Ohio 1984) (same). "Proximate cause requires that the loss of profits is the probable result of the breach of contract. Otherwise stated, the damages must have been directly caused by

the wrongful breach, not by something else." <u>Texlon</u>, 2005 WL 2292800, at *37.

"Both the existence and the amount of lost profits must be demonstrated with reasonable certainty to be recoverable." <u>Bobb Forest Prods., Inc. v. Morbark Indus., Inc.</u>, 783 N.E.2d 560, 579 (Ohio Ct. App. 2002) (internal citations omitted). "A fact is 'reasonably certain' if it is probable or more likely than not." <u>Id.</u> The absence of evidence proving proximate cause means an award of damages would be speculative. <u>DeMuesy v. Haimbaugh</u>, No. 91AP-212, 1991 WL 281411, at *11 (Ohio Ct. App. Dec. 31, 1991).

A plaintiff has the burden of proving proximate cause. It may satisfy this burden in the same way plaintiffs are able to prove lost profits generally. <u>Cf.</u> <u>AGF, Inc. v. Great Lakes Heat Treating Co.</u>, 555 N.E.2d 634, 638 (Ohio 1990). This can be done through expert testimony, economic data, and other means. <u>Id.</u> at 640. Here, Global has an expert who has opined about damages, but has not given an opinion on proximate cause. Instead, Global simply states that its machines would have satisfied the requirements listed by the respective lotteries, and assumes damages as a result.[15] Global has fallen short in

_____

[15] Practically speaking, Global could have retained an expert to opine about whether the Playpoint and Counterpoint machines would have satisfied the RFPs from the various states Global has identified.

its proof by offering only supposition, and no evidence of proximate cause except for supposition. For that reason, GTECH's Motion for Summary Judgment with respect to its marketing efforts is granted.

IV.  Conclusion

For the reasons stated above, Plaintiff's Motion for Partial Summary Judgment is GRANTED IN PART AND DENIED IN PART and Defendant's Motion for Partial Summary Judgment is GRANTED IN PART AND DENIED IN PART.


IT IS SO ORDERED.

_____
William E. Smith
Chief Judge
Date:  November 5, 2014